# 24-1064

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

SOL BACK,

*Plaintiff-Appellant,*

-against-

BANK HAPOALIM, B.M. and GIL KARNI,

*Defendants-Respondents.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

**BRIEF FOR PLAINTIFF – APPELLANT**

LAW OFFICE OF ALEXANDER SAKIN, LLC
Alexander Sakin
5 West 37th St., Suite 601
New York, NY 10018
(917) 509-7573

*Attorney for Plaintiff-Appellant*

## CONTENTS

JURISDICTIONAL STATEMENT……………….…………….……..……...1

ISSUES PRESENTED FOR REVIEW ……………….……......………………..2

STATEMENT OF THE CASE ……………….……...…………….…..………..3

SUMMARY OF ARGUMENT ……………….…….....…………….…..……...11

STANDARD OF REVIEW …………….…….......…………….…..……...14

ARGUMENT …………….……......…………….……….…..……...14

    I.  BACK PROPERLY PLED THAT DEFENDANTS-APPELLEES TOOK AN ADVERSE ACTION AGAINST HER ………….……………………...15

        A.   Back's Transfer to the Compliance Department Constituted an Adverse Employment Action …………………………......…16

        B.   In the Alternative, Back Adequately Alleged that She Was Constructively Discharged …………….……22

    II.  BACK PROPERLY PLED THAT HER SEX WAS A MOTIVATING FACTOR IN THE ADVERSE EMPLOYMENT ACTION TAKEN AGAINST HER……………………………………………...…26

        A.   Back Was Similarly Situated to the Five Male Comparators …………………..……...…27

        B.   Allegations of Misogynistic Culture Further Support an Inference of Discrimination ………………………...……...33

CONCLUSION…………….……………………….……….….…………….…35

CERTIFICATE OF COMPLIANCE WITH FRAP 32(A) …….…………….....36

# AUTHORITIES CITED

**Cases**

*Anderson News, LLC v. Am. Media, Inc.*,
    680 F.3d 162, 185 (2d Cir. 2012) …………………………………………...14

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544, 555 (2007) ……………………………………………...…14

*Beyer v. County of Nassau*,
    524 F.3d 160, 165 (2d Cir. 2008) …………………………………………...16

*Braunstein v. Sahara Plaza, LLC*,
    2021 U.S. Dist. LEXIS 120115
    (S.D.N.Y. June 28, 2021) ……………………………………………...…34

*Chen v. Shanghai Café Deluxe, Inc.*,
    2019 U.S. Dist. LEXIS 46330
    (S.D.N.Y. Mar. 8, 2019) …………………………………………………24

*Cherry v. American Tel. & Tel Co.*,
    47 F.3d 225, 229 (7th Cir. 1995) …………………………………………30

*Chertkova v. Connecticut Gen. Life Ins. Co.*,
    92 F.3d 81, 90 (2d Cir. 1996) ……………………………………………23

*Chinnery v. N.Y. State Office of Children & Family Servs.*,
    2012 U.S. Dist. LEXIS 162708
    (S.D.N.Y. Nov. 5, 2012) …………………………………………...……15

*Claes v. Boyce Thompson Inst. for Plant Research*,
    88 F. Supp. 3d 121, 128 (N.D.N.Y. 2015) …………………………18, 20, 21

*Colbert v. FSA Store, Inc.*,
    2020 U.S. Dist. LEXIS 73985
    (S.D.N.Y. Apr. 27, 2020) ………………………………………………..33

*Cooper v. Templeton*,
    629 F. Supp. 3d 223, 228 (S.D.N.Y. 2022) …………………………………29

*Dall v. St. Catherine of Siena Med. Ctr.*,
966 F. Supp. 2d 167, 184 (E.D.N.Y. 2013) ......................................30

*Davis v. Metro N. Commuter R.R.*,
2023 U.S. Dist. LEXIS 106581
(S.D.N.Y. June 20, 2023) ..................................................29

*Davis v. Metro N. Commuter R.R.*,
2024 U.S. App. LEXIS 7918
(2d Cir. Apr. 3, 2024) .....................................................29

*De La Cruz v. New York City Human Resources Admin. Dep't of Social Servs.*,
82 F.3d 16, 21 (2d Cir. 1996) ..............................................17

*Delia v. Donahoe*,
862 F. Supp. 2d 196, 216 (E.D.N.Y. 2012) ..............................31

*Dotson v. City of Syracuse*,
2019 U.S. Dist. LEXIS 205709
(N.D.N.Y. Nov. 27, 2019) ............................................27, 33

*Dowrich-Weeks v. Cooper Square Realty, Inc.*,
535 Fed. Apx. 9, 11-12 (2d Cir. 2013) ................................20

*Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*,
783 F.3d 395, 405 (2d Cir. 2015) .....................................14

*Fox v. City Univ. of New York*,
1999 U.S. Dist. LEXIS 718
(S.D.N.Y. Jan. 25, 1999) .............................................24

*Gibson v. County of Suffolk*,
2022 U.S. Dist. LEXIS 29887
(E.D.N.Y. Feb. 18, 2022) ............................................18

*Gorzynski v. JetBlue Airways Corp.*,
596 F.3d 93, 109 (2d Cir. 2010) .....................................28

*Graham v. Long Island R.R.*,
230 F.3d 34, 39 (2d Cir. 2000) ....................27, 28, 29, 30, 32

iii

*Halbrook v. Reichhold Chems., Inc.*,
    735 F. Supp. 121, 127 (S.D.N.Y. 1990) ……………………………....…22, 26

*Hill v. Rayboy-Brauestein*,
    467 F. Supp. 2d 336, 356 n.22 (S.D.N.Y. 2006) ……………………………23

*Kassman v. KPMG LLP*,
    925 F. Supp. 2d 453, 475 (S.D.N.Y. 2013) …………………………………23

*Kear v. Katonah Lewisboro Cent. Sch. Dist.*,
    2007 U.S. Dist. LEXIS 9094
    (S.D.N.Y. Feb. 7, 2007) ………………………………………………………15

*Kelly v. Metro-North C. Railroad*,
    1989 U.S. Dist. LEXIS 15025
    (S.D.N.Y. Dec. 18, 1989) …………………………………………………....25

*Lawrence v. Mehlman*,
    389 Fed. Appx. 54, 56 (2d Cir. 2010) ………………………………………16

*Littlejohn v. City of New York*,
    795 F.3d 297, 312 (2d Cir. 2015) …………………………………………...27

*Madray v. Long Island Univ.*,
    789 F. Supp. 2d 403, 410 (E.D.N.Y. 2011) …………………………………23

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792, 804 (1973) …………………………………………………...32

*McGuinness v. Lincoln Hall*,
    263 F.3d 49, 54 (2d Cir. 2001) …………………………………………...…32

*Morris v. Schroder Capital Mgmt. Int'l*,
    481 F.3d 86, 88 (2d Cir. 2007) …………………………………………...…22

*Muniz v. City of New York*,
    2023 U.S. Dist. LEXIS 172413
    (S.D.N.Y. Sept. 26, 2023) …………….……………………………....…21

*Murray v. Coleman*,
    2014 U.S. Dist. LEXIS 90884
    (W.D.N.Y. July 2, 2014) ……………………………………………...16

*N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*,
    709 F.3d 109, 119 (2d Cir. 2013)………………………………….....14

*Ramsaroop v. Dep't of Educ. of N.Y.*,
    2023 U.S. Dist. LEXIS 186
    (S.D.N.Y. Jan. 2, 2023)…………………………………………….28

*Riedinger v. D'Amicantino*,
    974 F. Supp. 322, 331 (S.D.N.Y. 1997) …………………………….25

*Schneider v. Regency Heights of Windham, LLC*,
    2016 U.S. Dist. LEXIS 173410
    (D. Conn. Dec. 15, 2016) ……………………………………….....28

*Scott v. Harris Interactive, Inc.*,
    512 Fed. Appx. 25, 28 (2d Cir. 2013) ………………………………22

*Sharp v. City of Houston*,
    164 F.3d 923, 933 (5th Cir. 1999) …………………………………..16

*Siuzdak v. Sessions*,
    295 F. Supp. 3d 77, 100 (D. Conn. 2018) ………………………17, 19

*Swiderski v. Urban Outfitters, Inc.*,
    2017 U.S. Dist. LEXIS 207451
    (S.D.N.Y. Dec. 18, 2017) …………………………………………17, 19

*Terry v. Ashcroft*,
    336 F.3d 128, 138 (2d Cir. 2003) …………………………………....21

*Treglia v. Town of Manlius*,
    313 F.3d 713, 720 (2d Cir. 2002) …………………………………...16

*Vega v. Hempstead Union Free Sch. Dist.*,
    801 F.3d 72, 87 (2d Cir. 2015)………………………………….…14, 33

*Windsor v. Tishman Speyer Props., L.P.*,
     2002 U.S. Dist. LEXIS 12304
     (S.D.N.Y. July 8, 2002) ………………………………………………35

**<u>Statutes</u>**

28 U.S.C. § 1291…..…..……….…..………..…………………...............1

28 U.S.C. § 1331 …..…..……….…..………..…………………...............1

28 U.S.C. § 1343 …..…..……….…..………..…………………...............1

42 U.S.C. § 2000e, *et seq*…..…..……….…..………..…………………...............1

28 U.S.C. § 1367…..…..……….…..………..…………………...............1, 10

Fed. R. Civ. P. 12(b)(6) …..…..……….…..………..…………..……....…1, 10, 14, 18

## JURISDICTIONAL STATEMENT

This is a civil action brought by Plaintiff-Appellant Sol Back, a female, against Defendants-Appellees Bank Hapoalim, B.M. ("BHI") and Gil Karni, over which the District Court had original subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 & 1343, as the action for sex discrimination arose under the laws of the United States, and specifically, Title VII, 42 U.S.C. § 2000e, *et seq*. This District Court had supplemental jurisdiction over Plaintiff-Appellant's New York State and City claims pursuant to 28 U.S.C. § 1367(a), because those claims are inexorably related to, arises out of the same operative facts and circumstances as, and is a necessary, integral part of the federal law claim, such that the federal claim and New York State and City claims form part of the same case or controversy. On or about November 4, 2022, Plaintiff-Appellant timely filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission (EEOC). On January 31, 2023, the EEOC issued a Right to Sue Notice to Plaintiff-Appellant. (A 051-054) This Court has jurisdiction under 28 U.S.C. § 1291.

This appeal is from a final order and judgment that disposes of all federal claims. On March 21, 2024, the Hon. Edgardo Ramos issued an Opinion & Order ("Decision"), granting Defendants-Appellees' motion to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6), and refusing to exercise jurisdiction over

Plaintiff-Appellant's New York State and City claims. (A 055-074) On April 19, 2024, Plaintiff-Appellant filed a notice of appeal with the District Court. (A 076)

## ISSUES PRESENTED FOR REVIEW

1.    Whether the District Court mistakenly held that Plaintiff-Appellant Sol Back, who had worked as Executive Assistant to BHI's CEO, failed to "adequately allege . . . any other adverse employment action" (A 068) where Back alleged that Defendants-Appellees forcibly transferred her to an objectively less prestigious position in the Compliance Department, away from the center of power that was her existing job of Executive Assistant to the CEO.

2.    Whether the District Court mistakenly held that Plaintiff-Appellant Sol Back, who had worked as Executive Assistant to BHI's CEO, failed to "adequately allege a constructive discharge" (A 068) where Back alleged that Defendants-Appellees forced her to choose between termination or a transfer to a less prestigious role in the Compliance Department.

3.    Whether the District Court mistakenly held that the five male executives who were engaged in identical conduct as the female Back, and were subject to the same whistleblower policy as was Back, were not similarly situated to her.

4.     Whether the District Court mistakenly held that Back's extensive allegations of a misogynistic culture at BHI did not support an inference of discrimination.

## STATEMENT OF THE CASE

Plaintiff-Appellant Sol Back is a 46 year-old woman, who was terminated from her position of Executive Assistant, when she objected to the conduct of her high-powered direct supervisor – Defendant-Appellee Gil Karni, the CEO of the New York Branch of Defendant-Appellee Bank Hapoalim, B.M. ("BHI"), Israel's largest bank.

In 2016, Back was hired as Executive Assistant to Gabriel Hamani, then CEO of the New York Branch of BHI.  (A 010, ¶19)  As Executive Assistant to the CEO, interacting with the bank's most senior executives on a daily basis, Back was regularly assigned substantive, non-"secretarial" tasks.   She actively managed the schedule of the New York Branch CEO, organized high-level meetings, including those involving BHI's global CEO, assisted with translating documents, and with preparing various corporate presentations, and generally acted as her high-powered boss' right- hand.  (A 010, ¶20)

In late 2020, Defendant -Appellee Gil Karni became CEO of the New York Branch of BHI.  (A 012, ¶29)  Back first met Karni in December 2020, as soon as

he took up his position. Her first interaction with Karni pointed to a hard-driving executive with little concern for her wellbeing or health. (A 012, ¶31)

At that time, in December 2020, Karni scheduled his first meeting with Back at BHI's Manhattan office. This meeting resulted in Back's first trip to the office since the onset of the COVID-19 pandemic in March 2020. (A 012, ¶32) To Back's annoyance, at her December 2020 meeting, Karni ordered her to immediately resume reporting to the office on every workday, as before the pandemic. Considering that BHI employees were asked to return to in-office work only in May 2022, this demand was particularly onerous. As Back later learned, three other employees – all female support staff members to the CEO – were similarly ordered to return to in-person work at the office. (A 013, ¶¶34-35)

Back, a single mother, had no choice but to submit to Karni's demand, while the three other female staff members chose to resign rather than return to in-office work. Back thereby became the first and only employee of BHI (other than Karni) to work from its Manhattan office. BHI's employees did not return en-masse to the New York office until the spring of 2022, over a year later. And Back returned to in-office work at a time when the U.S. had recorded the most coronavirus-related deaths over a weeklong period. (A 013, ¶36)

Karni's behavior proved to be, at times, boorish. For example, displaying what Back correctly perceived as a misogynistic streak, Karni would regularly

scratch his crotch while standing near her, and would order her to set his office desk for lunch and then to clear his dirty plates once he was done. (A 013-014, ¶38) Karni's misogyny manifested itself in other, more tangible ways. In keeping with what Back witnessed at their first meeting, Karni routinely expected Back (who is Jewish) to work into the Sabbath and during other Jewish holidays. By contrast, Back's male colleagues, including Senior Vice Presidents Mitchell Barnett and Glenn Bond, were regularly permitted by Karni to leave or stop working early on Fridays and in advance of Jewish holidays. (A 014, ¶39)

Karni's misogyny was not unique at BHI. Throughout the course of her career, Back was subjected to subtle and not-so subtle instances of sexual harassment. For example, another executive had offensively touched Back's fingers, and had sent her unsolicited flowers. Other senior executives would offensively stare at Back, take her picture, and comment on her looks, evidencing a bank-wide culture of misogyny and impunity. (A 014, ¶¶40-41)

Nevertheless, Back continued excelling at her job. In December 2021, as a *de facto* Chief of Staff to the CEO, Back been named in a BHI publication as an "MVP" employee, the "soul of BHI," who "exemplifies integrity, excellence and care," and as someone about whom "many would agree that most of what goes on [at] BHI runs smoothly because of her." (A 010, ¶¶21; A 015, 45) All that changed in short order, however.

5

In December 2021, as the Omicron variant of COVID-19 swept the world, Karni – who had become BHI's CEO the year before – fell ill with the virus after coming back from a trip to Las Vegas and Florida. (A 015-16, ¶¶46-50) Seeking to project an image of "strength" as the new CEO, and acting in complete disregard for the health and safety of the employees he was entrusted to lead, the fevered, ill Karni insisted on holding in-person meetings with multiple colleagues (including a Credit Committee meeting attended by 40 people), and even chose to attend an in-office holiday party filled with some 90 employees, all while Back and other employees implored him to stay home. (A 016-17, ¶¶53-55)

Prior to the holiday party, Back warned BHI's Chief People Officer of Karni's health condition. Despite being warned of Karni's obviously sick state, both verbally and in writing, HR brushed aside Back's warnings, and the party went on as planned, with Karni in attendance. Worse, at the party, HR staff encouraged employees to take off their masks. (A 017, ¶57)

As a result of Karni's reckless behavior, nearly 30 BHI employees, including Back, fell sick with COVID-19, and one even required hospitalization. (A 019, ¶64) A concerned Back, a single mother of two children whose own 80-year-old mother – a senior particularly vulnerable to the virus – was living with her, lodged a confidential complaint to BHI, pursuant to the bank's whistleblower process, over the conduct of Karni, and over HR's inaction, requesting that BHI "ensure

6

that no one experiences the consequences of BHI's inaction" in enforcing corporate COVID-19 policy. (A 020-21, ¶71-76) Five other employees, all male executives, also complained about Karni's conduct. (A 030, ¶128)

In response to this criticism, BHI sought to destroy the career of just one of the complainants – the female Back. Having been named as an "MVP" employee *days* before her complaint, Back was now seen as a pesky nuisance to executive bigwigs.

Initially, even though Back's complaint should have been kept confidential in accordance with the bank's policy, Karni's demeanor toward Plaintiff changed a short time after the complaint's filing. (A 022-23 at ¶82) At first, Back noticed a precipitous drop in communications directed to her from senior executives, even though at all relevant times, she served as the main point of contact between those executives and Karni. While Dov Kotler, the Global CEO, had sent her more than 30 WhatsApp text messages in 2019, and more than 50 such messages in 2020 and in 2021, Back had received zero messages from him since December 12, 2021, shortly after she had submitted her complaint. It was apparent that she was being treated as an outcast by people with whom she had closely worked in the past. (A 024, ¶89)

Then, in March 2022, Karni delivered a scathing, insulting, and entirely baseless job review to Back, telling her brutally, and without any explanation: "I

7

don't get what you are doing at your station" and that she was "not doing her job." (A 024, ¶92)  This was the first review of such kind that she had ever received while at BHI, and it came on the heels of her being awarded "MVP" status some three months before.

Around that time, Back was summoned for a meeting by BHI's General Counsel Vicki Andreadis.  During that meeting, held on April 5, 2022, Back recounted Karni's behavior toward her, including the scathing bonus review, told Andreadis that it was abundantly clear that the bank failed to maintain her identity as whistleblower confidential, and that Karni, who knew that Back was a whistleblower, was obviously retaliating against her for complaining about his misconduct.  Andreadis reacted defensively, but admitted that Karni "may have" found out that Back was the whistleblower through colleagues at the Tel Aviv headquarters, where Back's complaint was discussed.   When Back brought up BHI's utter failure to address staff concerns during December's COVID-19 outbreak, Andreadis allowed that Karni, and the HR Department, "need to get better at communicating."  (A 025, ¶¶96-97)

Then, implicitly conceding that Karni's behavior toward Back was unacceptable, Andreadis proposed a possible "solution" -- that Back either move to a different department at BHI or consider a "severance package."  Back responded in no uncertain terms that she loved her job and valued her career, and had no

8

interest in the termination, even with severance, that was being proposed. Back also made clear that any transfer away from Karni, the center of power, would be retaliatory, and would be perceived by her colleagues for what it was – a demotion. She had no interested in being tarred as a result of someone else's misconduct, through no fault of her own. No resolution was reached during this meeting. (A 025-26, ¶¶98-99)

Later that day, Back saw Andreadis meeting alone with Karni in a conference room outside the senior management suite. This was an unusual location for a business meeting, as Karni's meetings mostly took place in the senior management suite, near Back's desk. But, significantly, the conference room was out of Back's earshot. At this point, Back started to suspect even more that Andreadis was not her friend in this affair. (A 026, ¶101)

Back continued working over the next two months, and despite her strained relation with Karni, carried out her duties competently and efficiently, hoping that things would blow over and that Karni would swallow his pride and treat her with respect. That was not to be. (A 026, ¶102)

That Karni's hostile behavior toward Back continued suggested that the bank was doing nothing to address this clear case of retaliation, despite Back's pleas. Worse, it was Back who was now in the bank's crosshairs. (A 026, ¶103)

On May 31, 2022, Andreadis called Back to a second meeting. At this meeting, Andreadis remained firm that Back's remaining options were termination or effective demotion. Back refused the "choice" and on June 2, 2022, Andreadis ordered Back transferred to the Compliance Department for a week as a "temporary alternative." (A 026-29 ¶¶104-115) Back's position as Executive Assistant, and her career at BHI, were effectively terminated, through no fault of her own. Later in June 2022, while Back was away on sick leave, her attorney sent a letter to BHI, outlining her claims, and stating her position that she was retaliated against and was constructively terminated through the June 2 "transfer" to the Compliance Department. In the course of its communications with Back's counsel, BHI officially terminated her effective June 21, 2022, while she was still on sick leave. (A 029, ¶¶116-118)

To add to the outrage, none of the five male executives who openly complained about Karni's conduct in December 2021 were disciplined, let alone were, as their female colleague, demoted or terminated. (A 029, ¶¶120)

The District Court's Opinion & Order dated March 21, 2024 (Ramos, J.) dismissed Back's Title VII claim for sex discrimination pursuant to Fed. R. Civ. P. 12(b)(6), and declined to exercise jurisdiction over her related New York State and New York City claims pursuant to 26 U.S.C. § 1367(c)(3). (A 055-074) Back filed a timely Notice of Appeal on April 19, 2024. (A 076)

## SUMMARY OF ARGUMENT

Plaintiff-Appellant Sol Back is a woman who was terminated from her position of Executive Assistant, when she objected to the conduct of her high-powered direct supervisor – Defendant-Appellee Gil Karni, the CEO of the New York Branch of Defendant-Appellee Bank Hapoalim, B.M. ("BHI" or the "Bank"), Israel's largest bank.

Just a few weeks before, in December 2021, Back had been named in a BHI publication as an "MVP" employee, the "soul of BHI," who "exemplifies integrity, excellence and care," and as someone about whom "many would agree that most of what goes on [at] BHI runs smoothly because of her." (A 015, ¶45)

All that changed days later, when Back complained about Karni's reckless disregard for employee health and safety, after Karni insisted on holding in-person meetings with multiple colleagues while himself visibly sick with COVID-19. Karni's behavior resulted in scores of employees, including Back, falling sick with COVID-19.

Five other employees, all male executives, also complained about Karni's conduct. None of these five male executives suffered any consequence as a result of their complaints. Not so Back. A few weeks after Back's December 2021 complaint, in March 2022, Back received a scathing review from Karni, and shortly after was threatened with termination, barring her  consent to a transfer to

11

an unrelated job in the Compliance Department.  After Back objected to this
obvious threat, she was first transferred to the Compliance Department, and then
terminated in June 2022.

In sum, in response to a barrage of employee criticism of Karni's
misconduct, BHI sought to destroy the career of just one of the complainants – the
female Back.  Having been named as an "MVP" employee days before her
complaint, Back was now seen as a pesky nuisance to executive bigwigs, and was
fit to be eliminated.

In finding that Back failed to plead sex discrimination under Title VII of the
Civil Rights Act of 1964 (Title VII), the District Court (Ramos, J.) misconstrued
the Complaint and the law, committing three principal errors.

First, the Court mistakenly held that Back failed to "adequately allege a
constructive discharge, or any other adverse employment action."  (A 068)  As part
of this determination, the Court found that Back's forced transfer to the
Compliance Department was not a demotion, or an adverse employment action.
Yet Back clearly alleged that this forced transfer was to an objectively less
prestigious position, away from the center of power that was her existing job of
Executive Assistant to the CEO.  As such, Back properly pled that she was
subjected to an adverse employment action.

Relatedly, the District Court held that "constructive termination" was not made out because the "[C]omplaint does not allege that Back's continued employment was explicitly conditioned on accepting [a transfer or termination]." (A 066) Yet in fact, the Complaint explicitly alleges that Back was, among other things, forced to choose between termination or a transfer to a less prestigious role in the Compliance Department. (A 027, ¶¶105-106) Second Circuit law, such allegations support Back's theory of constructive discharge.

<u>Second</u>, the Court improperly found that the five male executives who – unlike Back -- complained about Karni but were not disciplined, were not "similarly situated" to her (A 071) because their job responsibilities were different from Back's. But in doing so, the Court ignored the facts pertinent to this case, and namely, the Complaint's allegations that these males were engaged in identical conduct, and were subject to the same whistleblower policy as was Back. For purposes of complaining about Karni's behavior, Back's male colleagues were similarly situated to her, and are thus proper comparators.

Finally, the District Court mistakenly found that Back's extensive allegations of a misogynistic culture at BHI do not support an inference of discrimination. (A 071) But in fact, those allegations of past sexual harassment and discrimination, certainly support Back's claim at this pre-discovery stage.

## STANDARD OF REVIEW

This Court "review[s] de novo the dismissal of a complaint under Rule 12(b)(6), accepting all factual allegations as true and drawing all reasonable inferences in favor of the plaintiff." *N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 119 (2d Cir. 2013). *See also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (holding that the Court must assume "all the allegations in the complaint are true (even if doubtful in fact).").

Factual disputes are "inappropriate for resolution on a motion to dismiss." *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 405 (2d Cir. 2015). The choice between two plausible inferences drawn from factual allegations is for the factfinder, not the Court. *See Anderson News, LLC v. Am. Media, Inc*., 680 F.3d 162, 185 (2d Cir. 2012). "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and that a recovery is very remote and unlikely." *Id*.; *see also Twombly*, at 556.

## ARGUMENT

To plead a claim for discrimination, including on the grounds of sex, under Title VII, a plaintiff should allege that: (1) the employer took adverse action against her and (2) her sex was a motivating factor in the employment decision. *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015).

The District Court mistakenly found that Back failed to plead, in her 147-page Complaint, that any adverse action was taken against her, or that her sex was a motivating factor in the employment decision. The District Court's decision utterly misconstrues the Complaint and the law.

## I.   Back Properly Pled that Defendants-Appellees Took an Adverse Action Against Her

At "the pleading stage, a court need not determine that every fact a plaintiff alleges amounts to an adverse employment action." *Chinnery v. N.Y. State Office of Children & Family Servs.*, 2012 U.S. Dist. LEXIS 162708, at *12-13 (S.D.N.Y. Nov. 5, 2012) (internal citation omitted). After all, on a motion to dismiss, "whether certain employment actions qualify as adverse for the purposes of Title VII, is a fact-specific inquiry . . . to be resolved at a later stage of litigation." *Id*; *Kear v. Katonah Lewisboro Cent. Sch. Dist.*, 2007 U.S. Dist. LEXIS 9094, at *7 (S.D.N.Y. Feb. 7, 2007) (same). Here, the Court improperly found that Back's "transfer to compliance" was not a demotion, given that Back purportedly pled nothing but her "subjective belief that 'any transfer away from' her current job [was] unacceptable." (A 067) And the Court also found that the cumulative effect of actions taken against Back after her complaint against Karni cannot support an allegation of constructive discharge. (A 064, n. 6) Both findings misunderstand the law and the Complaint.

### A. Back's Transfer to the Compliance Department Constituted an Adverse Employment Action

In "general, whether a job-related action was 'adverse' presents a question of fact." *Murray v. Coleman*, 2014 U.S. Dist. LEXIS 90884, at *15-16 (W.D.N.Y. July 2, 2014) (citing *Lawrence v. Mehlman*, 389 Fed. Appx. 54, 56 (2d Cir. 2010) ("Reprimands or negative evaluation letters may, in some circumstances, constitute adverse employment action, . . . and whether they do is typically a question of fact for the jury."). And, the Second Circuit has been explicit in holding that "adverse employment actions" do not have to result in a loss of income. *Treglia v. Town of Manlius*, 313 F.3d 713, 720 (2d Cir. 2002) ("[W]e have made clear that adverse employment actions are not limited to 'pecuniary emoluments.'") (internal citation omitted).

This broad-minded view of what constitutes an "adverse employment action" has guided the Court's jurisprudence in cases involving, as here, an involuntary transfer. In dealing with involuntary transfers, this Court has held that an adverse employment action can exist when an employee's new assignment is "materially less prestigious, materially less suited to his skills and expertise, or materially less conducive to career advancement." *Beyer v. County of Nassau*, 524 F.3d 160, 165 (2d Cir. 2008) (internal citation omitted); *see also Sharp v. City of Houston*, 164 F.3d 923, 933 (5th Cir. 1999) ("To be equivalent to a demotion, a transfer need not result in a decrease in pay, title, or grade; it can be a demotion if

16

the new position proves objectively worse—such as being less prestigious or less interesting or providing less room for advancement.").

A forced transfer to a less prestigious position is, thus, an adverse employment action for purposes of Title VII, as found on summary judgment in multiple cases. For example, the Second Circuit, on an appeal of a summary judgment grant, found that an "adverse employment action" was shown where plaintiff, a civil service worker, merely "contend[ed] that by transferring him from the Adoption Unit to the Foster Care Unit, defendants moved him from an 'elite' division of DSS, which provided prestige and opportunity for advancement, to a less prestigious unit . . .". *De La Cruz v. New York City Human Resources Admin. Dep't of Social Servs.*, 82 F.3d 16, 21 (2d Cir. 1996). Likewise, in a case involving a clothing store sales associate, again on summary judgment, the Court found that a transfer constituted an "adverse employment action" where "[t]he evidence indicate[d] that [plaintiff's] assignment to the back stock was generally perceived to be undesirable and even punitive." *Swiderski v. Urban Outfitters, Inc.*, 2017 U.S. Dist. LEXIS 207451, at *33 (S.D.N.Y. Dec. 18, 2017). Similarly, in *Siuzdak v. Sessions*, in denying employer's motion for summary judgment, the Court held that plaintiff "offered admissible evidence" that his employer's assignment of certain work amounted to an "adverse employment action" where plaintiff's coworker testified that plaintiff's new assignment "[was] less prestigious than

17

investigative assignments" and where the coworker stated that he "understood [the employer's] directive to mean that, even though [plaintiff] would maintain the same position, he would be engaged in less desirable work." 295 F. Supp. 3d 77, 100 (D. Conn. 2018).

On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), even less factual detail is required. In a case with striking parallels to the facts alleged here, the Court denied the employer's motion to dismiss, finding that plaintiff's transfer away from her position as Executive Assistant to her employer's president, was an "adverse change in the terms and conditions of her employment": "[i]t is similarly reasonable to infer that the position of Technology Transfer Specialist is less distinguished and contemplates lesser responsibilities than the Executive Assistant to the President." *Claes v. Boyce Thompson Inst. for Plant Research*, 88 F. Supp. 3d 121, 128 (N.D.N.Y. 2015). Likewise, an adverse action was pled where plaintiff police officer simply "alleged in his complaint that he was involuntarily transferred from the Criminal Intelligence Section to a general detective squad, which is less prestigious." *Gibson v. County of Suffolk*, 2022 U.S. Dist. LEXIS 29887, at *41-42 (E.D.N.Y. Feb. 18, 2022).

Here, in finding that no adverse employment action was pled, the Court held that Back merely pled "her own subjective belief that 'any transfer away from' her

current job would be unacceptable, and would be 'perceived by her colleagues' as a demotion."  (A 067)  This misstates both the Complaint and the law.

First, that Back's colleagues would perceive the transfer as a demotion surely goes to the issue of whether the transfer was a demotion.  As discussed above, evidence that others perceived the new job as less distinguished is regularly cited by the Courts on summary judgment to support findings that an adverse employment action took place.  *See supra*, *Swiderski*, 2017 U.S. Dist. LEXIS 207451, at *33; *Siuzdak*, 295 F. Supp. 3d at 100.  Here, Appellant should likewise be given the chance to develop this record more fully through discovery.

Second, in any event, Back has sufficiently pled that a transfer away from her position as Executive Assistant to the Bank's CEO would be a demotion.  As is detailed in the Complaint, as Karni's Executive Assistant, Back was no mere clerk: "Back became a kind of Chief of Staff to the CEO, and as such, became the CEO's main point of contact with head office executives, including the Global CEO, the Deputy Global CEO for International Activities and other high-ranking members of the Board of Management and Board of Directors."  (A 010, ¶21)  As such, it was reasonable to suppose that "any transfer away from the center of power" – from what was, in effect, a Chief of Staff position to BHI's top officer – to the Compliance Department would be a demotion, and "would be perceived by [Back's] colleagues" as such.  (A 026, ¶99)  In identical circumstances in *Claes*,

19

involving a plaintiff who was transferred from her position as Executive Assistant to the President to the "position of Technology Transfer Specialist" the Court held that it was "reasonable to infer that the position of Technology Transfer Specialist is less distinguished and contemplates lesser responsibilities than the Executive Assistant to the President." *Claes*, 88 F. Supp. 3d at 128. Notably, there was no discussion in *Claes* regarding the substance of the "Technology Transfer Specialist" position. What was obvious to the Court, however, was that a transfer away from the job of Executive Assistant to the President was a downgrade. Indeed, if "prestigious," as is commonly understood, means "very much respected and admired, usually because of being important,"[1] then a move from the position of Executive Assistant to the CEO to the Compliance Department, "away from the center of power," surely represents a downgrade in importance, and hence in prestige.

The Court's reliance on *Dowrich-Weeks v. Cooper Square Realty, Inc.*, where plaintiff's transfer was held not actionable, is revelatory, because that case had nothing to do with prestige or with a transfer away from a prestigious position. 535 Fed. Apx. 9, 11-12 (2d Cir. 2013). In that case, unlike here, there was nothing to suggest that plaintiff's transfer, while employed at a property management

---

[1] *See, e.g.,* https://dictionary.cambridge.org/us/dictionary/english/prestigious (last accessed on July 9, 2024)

company, from the position of "Residential Manager" to "On-Site Property Manager," was an adverse employment action because there was no evidence that the transfer represented "a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Id*. After all, the change of title from "Residential Manager" to "On-Site Property Manager" does not readily suggest a demotion. Not so with a transfer away from a job as Executive Assistant to BHI's top officer. Back's transfer away from such heights makes it "reasonable to infer" that her new position in Compliance was "less distinguished." *Claes*, 88 F. Supp. 3d at 128. *See also Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003) ("Examples of materially adverse changes include . . .other indices . . . *unique to a particular situation*.") (internal citation omitted) (emphasis added).

Further, because Back's entire career at BHI, since she started working at the Bank in 2016, was that of Executive Assistant to the CEO (A 010, ¶19), a job at the Compliance Department, where she never worked, would have necessitated a different skill set, in effect derailing Back's existing career. *Muniz v. City of New York*, 2023 U.S. Dist. LEXIS 172413, at *20 (S.D.N.Y. Sept. 26, 2023) (on summary judgment, finding that "the transfer of [plaintiff police officer] to patrol placed him in what was considered a less prestigious position and one that made use of entirely different skills than his position in the CAU," "establish[ing] a

21

question of fact as to whether [plaintiff's] transfer to patrol was a materially adverse action."). This circumstance further supports the finding that Back suffered an adverse employment change.

### B. In the Alternative, Back Adequately Alleged that She Was Constructively Discharged

To the extent the Complaint alleges that Back resigned her employment in the midst of intense pressure from Defendants-Appellees, she has stated a viable claim for constructive discharge. A constructive discharge, which is a form of adverse employment action, occurs "when the employer, rather than acting directly, deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." *Morris v. Schroder Capital Mgmt. Int'l*, 481 F.3d 86, 88 (2d Cir. 2007) (internal quotation marks omitted). Some examples of such intolerable conditions, which "may amount to constructive discharge" include "loss of pay or change in title." *Scott v. Harris Interactive, Inc.*, 512 Fed. Appx. 25, 28 (2d Cir. 2013) (on summary judgment, finding evidence of constructive discharge where employee ceased working after employer informed him his title would be changed and his salary reduced). Similarly, an employer "dashing reasonable expectations of career advancement may create intolerable working conditions that rise to the level of constructive discharge." *Halbrook v. Reichhold Chems., Inc*., 735 F. Supp. 121, 127 (S.D.N.Y. 1990).

22

The Court cited a footnote in *Hill v. Rayboy-Brauestein* for the proposition "that the Court [cannot] consider the cumulative effect of *non-adverse* employment actions when evaluating an intentional discrimination claim." 467 F. Supp. 2d 336, 356 n.22 (S.D.N.Y. 2006) (emphasis in the original). But that is not the law. The *Hill* Court was not dealing with the issue of constructive discharge. With respect to constructive discharge, the law in this Circuit is that "the effect of a number of adverse conditions in the workplace is cumulative" and it is "error to treat the various conditions as separate and distinct rather than additive." *Chertkova v. Connecticut Gen. Life Ins. Co.*, 92 F.3d 81, 90 (2d Cir. 1996) ("Because a reasonable person encounters life's circumstances cumulatively and not individually, it was error to treat the various conditions as separate and distinct rather than additive."). Notwithstanding any dicta in *Hill,* the holding of *Chertkova* remains the law in the Second Circuit, as evidenced by a number of District Court decisions. *See, e.g., Kassman v. KPMG LLP*, 925 F. Supp. 2d 453, 475 (S.D.N.Y. 2013) (citing *Chertkova*); *Madray v. Long Island Univ.*, 789 F. Supp. 2d 403, 410 (E.D.N.Y. 2011) (same).

Here, BHI took at least four deliberate steps which cumulatively rendered Back's working conditions intolerable.

First, in March 2022, Back received a scathing, career-ending review from Karni, her supervisor, who told her "I don't get what you are doing at your station"

23

and that you are "not doing your job." (A 024, ¶92) And this review, delivered in March 2022, followed weeks in which Defendants retaliated by taking active steps to isolate Back from her colleagues, with Karni telling her colleagues "to reduce their interactions with her," with the Global CEO ceasing all communication with her since December 2021 (despite sending her more than 50 messages in 2021 alone), and with other senior management following suit "even though they had been in nearly daily contact with [Back] before the filing of her complaint." (A 023-24, ¶¶83, 87, 89) Thus, not only was Back condemned by her supervisor, but she was actively being prevented from performing some of the key tasks for which she was hired – that of acting as the CEO's main point of contact with head office executives. (A 010, ¶21) *See Chen v. Shanghai Café Deluxe, Inc.*, 2019 U.S. Dist. LEXIS 46330, at *34 (S.D.N.Y. Mar. 8, 2019) (evidence of supervisor's "brusque and dismissive" comments, coupled with denial of work hours, "could lead a jury to draw the inference that Plaintiff reasonably understood that she was being denied work, such that she felt compelled to resign."); *Fox v. City Univ. of New York*, 1999 U.S. Dist. LEXIS 718, at *7 (S.D.N.Y. Jan. 25, 1999) ("A single disparaging statement by a supervisor may be enough to prove a constructive discharge.").

Second, in June 2022, Back was not merely offered a transfer to the Compliance Department. She was, rather, threatened by BHI's General Counsel

Andreadis, that she either agree to such transfer or else face termination. (A 027, ¶¶105, 106) *Riedinger v. D'Amicantino*, 974 F. Supp. 322, 331 (S.D.N.Y. 1997) (where plaintiff alleged, among other things, that "her employers twice threatened her with dismissal," finding that constructive discharge claim survives dismissal on summary judgment).

On this count, the Court mistakenly found that "the [C]omplaint does not include any allegations of an explicit threat." (A 066) But in fact, the Complaint is clear that, certainly during their second meeting on May 31, 2022, Andreadis explicitly threatened Back with termination or transfer to Compliance, with Back "being given an ultimatum – either accept a demotion masquerading as a 'transfer' or be fired" and with Andreadis "remain[ing] firm that Ms. Back's remaining options were termination or effective demotion." (A 027, ¶¶105, 106) That the Complaint does not include exact quotations of what was a verbally-communicated message does not change the fact that, contrary to the District Court's holding, it contains an allegation of an explicit threat of termination, barring Back's agreement to a demotion.

<u>Third</u>, Back had been an Executive Assistant since 2016, for her entire career at BHI. (A 010, ¶19) She had no interest in the compliance work foisted on her, for which she was not suited, and for which she lacked the requisite skill. *Kelly v. Metro-North C. Railroad*, 1989 U.S. Dist. LEXIS 15025, at *21 (S.D.N.Y.

25

Dec. 18, 1989) ("Demotion to a position which the employee is physically incapable of performing constitutes constructive discharge.").

Fourth, the forced transfer to the Compliance Department – on pain of termination – was, as discussed above, a demotion, and certainly, a "dashing [of Back's] reasonable expectations of career advancement . . .". *Halbrook*, 735 F. Supp. at 127. She was, after all, not just any Executive Assistant, but the Executive Assistant to the most senior person at BHI's New York office. In that role, she functioned as *de facto* Chief of Staff to Karni, serving as his point of contact with top management at BHI, including the Global CEO, the Deputy Global CEO for International Activities and other high-ranking members of the Board of Management and Board of Directors. As such, Back reasonably considered the loss of this job, on whatever financial terms, as a demotion. (A 026, ¶99)

Therefore, Back has alleged sufficient facts to support a constructive discharge from her position at BHI.

## II. Back Properly Pled that Her Sex Was a Motivating Factor in the Adverse Employment Action Taken Against Her

Back has properly alleged that she was subjected to discriminatory treatment because of her female sex for two reasons. First, she has asserted "more favorable treatment of employees not in the protected group" by specifically identifying five male colleagues who had engaged in the same conduct, yet faced no consequence

for their behavior. *Littlejohn v. City of New York*, 795 F.3d 297, 312 (2d Cir. 2015). Second, she has properly alleged "background evidence regarding gender discrimination by [d]efendants," further supporting her claim of discrimination. *Dotson v. City of Syracuse*, 2019 U.S. Dist. LEXIS 205709, at *5-6 (N.D.N.Y. Nov. 27, 2019).

Yet the District Court mistakenly found that Back's five male colleagues were not "similarly situated" to her, and that the background instances of misogyny at BHI were somehow unconnected to sex. On both counts, the District Court is mistaken.

### C. Back Was Similarly Situated to the Five Male Comparators

In finding that Back's allegations cannot raise an inference of discrimination on the basis of sex, the District Court seized on the fact that the five male comparators were not similarly situated to Back because they were executives, while she was an Executive Assistant, and that she reported to Karni, while they did not.

As an initial matter, like the argument concerning Back's subjection to an adverse employment action, this finding is not suited to a pre-discovery motion to dismiss. *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) ("Whether two employees are similarly situated ordinarily presents a question of fact for the

jury.") (citations omitted).  In any event, the five male colleagues, though holding

different jobs from Back, were similarly situated to Back in every relevant way.

As held by the Second Circuit, what constitutes "all material respects" "must

be judged" not on some arbitrary distinction in titles or ranks, but must be based on

"(1) whether the plaintiff and those he maintains were similarly situated were

subject to the same workplace standards and (2) whether the conduct for which the

employer imposed discipline was of comparable seriousness." *Ramsaroop v.*

*Dep't of Educ. of N.Y.*, 2023 U.S. Dist. LEXIS 186, at *28 (S.D.N.Y. Jan. 2, 2023)

(Ramos, J.) (citing *Graham*, 230 F.3d at 40); *see also Gorzynski v. JetBlue Airways*

*Corp.*, 596 F.3d 93, 109 (2d Cir. 2010) ("employees need not be of the exact same

rank to be considered 'similarly situated.'").  Thus, "[i]n deciding whether two

employees are similarly situated, the finder of fact should focus on the

standards and expectations of the employer," keeping in mind that

"a supervisor could be similarly situated to her subordinates if they were subject to

the same workplace standards." *Schneider v. Regency Heights of Windham, LLC*,

2016 U.S. Dist. LEXIS 173410, at *41-42 (D. Conn. Dec. 15, 2016).

What matters here is the nature of the conduct in which the employees

engaged, and the workplace standards implicated by that conduct.  But, contrary to

the District Court's holding, there is no *per se* rule requiring plaintiff to be of the

same rank, or to perform similar work, to her comparators – unless those factors

are relevant to evaluating the specific situation at hand. *Graham*, 230 F.3d at 40 (requiring only "a reasonably close resemblance of facts and circumstances" between comparators).

Thus, in *Cooper v. Templeton*, cited by the Court, plaintiff, who alleged discrimination on the basis of her female sex, was a female employee disciplined for engaging in racist behavior while walking her dog in Central Park – an incident that became "international news." 629 F. Supp. 3d 223, 228 (S.D.N.Y. 2022). In *Cooper*, plaintiff's male comparators – whatever their job titles -- engaged in misconduct that was "simply too different in kind to be comparable to her conduct," ranging from "plagiarism to insider trading to a felony conviction," none of it rising to the level of "international news," and none of it involving racist confrontations with others. *Id*.

Another decision cited by the District Court, *Davis v. Metro N. Commuter R.R.*, finding that employees were not similarly situated when there was "no evidence that the employees had a similar job, responsibilities, seniority [as plaintiff]," was – tellingly -- subsequently overturned by this Court. 2023 U.S. Dist. LEXIS 106581, at *21 (S.D.N.Y. June 20, 2023). In reversing the trial Court, the Second Circuit focused on the misconduct alleged – the employees' responsibility for a train collision – and not on any differences in titles. *Davis v. Metro N. Commuter R.R.*, 2024 U.S. App. LEXIS 7918, at *6-7 (2d Cir. Apr. 3,

2024).  Thus, this Court found that the comparator was similarly situated because, unlike with plaintiff, the employer "did not terminate [the comparator] for her role in the collision, but instead gave her another last chance waiver."  *Id*.  Nothing about this analysis suggests the kind of mechanical focus on titles and places in the corporate hierarchy that seems to be urged by the District Court.

Indeed, as held in *Graham*, a "company-wide policy uniformly applicable to all members of a group may be basis for comparing employees, regardless of particular job being performed."  230 F.3d at 42 (citing *Cherry v. American Tel. & Tel Co.*, 47 F.3d 225, 229 (7th Cir. 1995)).  The District Court ignored a wealth of precedent reflecting this doctrine.  For example, *Dall v. St. Catherine of Siena Med. Ctr.*, involved a male employee who was treated more harshly than a female colleague for violating the employer's sexual harassment policy.  966 F. Supp. 2d 167, 184 (E.D.N.Y. 2013).  In denying the employer's motion for summary judgment, the Court found that the male and female were "similarly situated," even though they held "different jobs" and were "supervised by different individuals," because they were, nevertheless, "subject to the same rules and regulations" of the sexual harassment policy.  *Id*.  Likewise, in another case, involving two employees of different ranks treated dissimilarly under the Workplace Violence Policy, plaintiff and a colleague were "similarly situated," even though the coworker was a

30

supervisor and plaintiff was not, as the policy was equally "applicable to all employees." *Delia v. Donahoe*, 862 F. Supp. 2d 196, 216 (E.D.N.Y. 2012).

In light of the facts at issue here, the jobs held by Back's comparators are not relevant to this analysis. There is no question that Plaintiff was similarly situated to the five male comparators, because the "workplace standards" at issue do not concern such title-specific expectations as, for example, typing speed or the ability to generate new business. Rather at issue is BHI's Whistleblower Policy in effect at the time of Back's complaint, which stated that BHI "does not permit retaliation against an employee, who, in good faith, has made a [c]omplaint," and that BHI "shall not discharge, demote, suspend, threaten, harass or in any manner discriminate against an employee in the terms and conditions of employment" as a result of that employee's complaint. (A 021-22, ¶77) There is every indication, and it would be natural to suppose, that this policy applied equally to all employees, without regard to rank or title. Six employees, five males and the female Back, complained about identical behavior – namely, Karni's disregard of employee health and safety after his return from Las Vegas and Florida in December 2021. (A 030, ¶128) Yet while the males suffered no career consequence, Back was demoted and then terminated.

Further, contrary to the Court's ruling, Back and her comparators engaged in materially – if not entirely – similar conduct. To be sure, "plaintiff is not obligated

31

to show disparate treatment of an *identically* situated employee." *McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001) (emphasis in original). In this regard, as pointed out in *Graham*, "[t]hat an employee's conduct need not be identical to that of another for the two to be similarly situated is also reflected in the language of *McDonnell Douglas*, where the Supreme Court used the phrase 'comparable seriousness' to identify conduct that might help to support an inference of discrimination." *Graham*, 230 F.3d at 40 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804 (1973)).

Overlooking this precedent, the District Court held that the conduct at issue was not "comparable" because the male employees are not alleged to have "filed a formal whistleblower complaint." (A 071) But the Complaint nowhere alleges that that BHI's Whistleblower Policy's anti-retaliation provisions applied only to those employees making use of complaint channels specified in the policy. Rather, by its terms, as alleged, and as one would expect, the policy's anti-retaliation provision applied to all employees, in effect encouraging all employees to raise concerns about violations of the law.

And whatever means the males used to complain, they all complained about the same misconduct on the part of Karni. Thus, to deem the comparators' conduct as not being of "comparable seriousness," is to eviscerate the "comparable

seriousness" standard enunciated by this Court in *Graham* and *McGuinness*, as explained above.

### D. Allegations of Misogynistic Culture Further Support Inference of Discrimination

Finally, evidence of other misogynistic behavior on the part of Karni and others at BHI furthers the inference of discrimination on the basis of sex. It is well-established that "background evidence regarding gender discrimination by [d]efendants," such as evidence of a misogynistic office culture in which male employees "watched pornography in the workplace without discipline," may be relevant to a claim of discrimination. *Dotson*, 2019 U.S. Dist. LEXIS 205709, at *5-6. In another case, that defendants placed a mocking "University of Puerto Rico" banner outside a Hispanic teacher's classroom and "attempted to transfer [plaintiff] to a Hispanic principal's school" was deemed by this Court to be "plausibly connected to [Plaintiff's] Hispanic background" and was thus relevant to "provide a contextual basis for inferring discrimination," even though such action was not, by itself, an adverse employment action. *Vega*, 801 F.3d at 88-89.

"Coded" language reflecting invidious stereotypes is also sufficient to support an inference of discrimination. For example, in *Colbert v. FSA Store, Inc.*, inference of discrimination on basis of plaintiff's Black race existed where plaintiff's supervisor "made a number of comments that can be plausibly be construed to reflect racial stereotyping or constitute coded racial comments such as

about [plaintiff's] presumed 'athletic skills' or 'athletic prowess' and whether
[plaintiff] had been admitted co college on an athletic scholarship." 2020 U.S.
Dist. LEXIS 73985, at *10-11 (S.D.N.Y. Apr. 27, 2020); *see also Braunstein v.
Sahara Plaza, LLC*, 2021 U.S. Dist. LEXIS 120115, at *30-31 (S.D.N.Y. June 28,
2021) (same, in case involving discrimination on basis of sex, where supervisor
called plaintiff a "bitch" and "not ladylike," among other things).

Back's Complaint contains extensive evidence of a culture of sex-based
harassment and discrimination, all directed against her. Sex-based harassment is
evidenced by Back's allegations that: a) Karni scratched his crotch while standing
near Back (A 013-014, ¶38); b) an executive had offensively touched Back's
fingers, and had sent her unsolicited flowers; and c) other senior executives would
offensively stare at Back, take her picture, and comment on her looks. (A 014,
¶¶40-41) And sex-based discrimination and disparate treatment is evidenced by
Back's allegations that: a) Karni would order her to set his office desk for lunch
and then to clear his dirty plates once he was done (A 013-014, ¶38); b) all of the
employees ordered to return to in-office work in December 2020, during the
pandemic, were female (A 013, ¶35); and c) Karni expected that Back work into
the Sabbath and during other Jewish holidays, while permitting her male
colleagues to leave early on those days. (A 014, ¶39) These allegations are far
worse than even the type of "coded" language (or even hanging a "University of

34

Puerto Rico" banner outside a Hispanic teacher's classroom, as in *Vega*) that has been deemed sufficient to support an inference of discriminatory intent. Thus, the District Court was mistaken in finding that Back's evidence of a misogynistic culture does not support an inference of discrimination. *See also Windsor v. Tishman Speyer Props., L.P.*, 2002 U.S. Dist. LEXIS 12304, at *13 (S.D.N.Y. July 8, 2002) (employer's "possibly stereotypical comments," including instructing Black employee not to wear his pants hanging below his waist, and evidence that "few African-Americans are ever hired" by employer, were sufficient to create inference of race discrimination).

## CONCLUSION

For the reasons stated above, the District Court's decision should be reversed and Back's Complaint should be reinstated in all respects.

Dated: July 9, 2024
        New York, NY

                                        LAW OFFICE OF ALEXANDER SAKIN,
                                        LLC

                                        _____
                                        Alexander Sakin
                                        5 West 37th St., Suite 601
                                        New York, New York
                                        10018 (917) 509-7573

35

## CERTIFICATE OF COMPLIANCE WITH FRAP 32(A)

1.     This brief complies with the type-volume limitation of FRAP Local Rule 32.l(a)(4)(1) because the brief contains 8,022 words, as counted by Microsoft Word For Mac, excluding the cover, table of contents, table of authorities, signature block, and certificates of counsel.

2.     This brief complies with the typeface requirements of FRAP Rule 32(a)(5) and the type style requirements of FRAP Rule 32(a)(6) because this brief has been prepared in 14 point Times New Roman font, a proportionally spaced typeface, using Microsoft Word For Mac.

LAW OFFICE OF ALEXANDER SAKIN, LLC

_____
Alexander Sakin
5 West 37th St., Suite 601
New York, New York
10018 (917) 509-7573